# Frost *v*. Bush.

*Trusts and trustees—Resulting trust—Statute of limitations—Act of*
*April 22, 1856, P. L. 532.*

Where it is alleged in a bill in equity to enforce a resulting trust as to
realty, that the defendant being the executrix of her husband, entered into
collusion with the holder of a mortgage against certain real estate of the
decedent to foreclose it, for the purpose of defrauding a creditor of the
decedent who held a judgment junior in lien to the mortgage, and vesting
the title in the executrix in her own right, clear of this debt of her
husband ; and where in fact a sheriff's sale was had on the mortgage,
which divested the judgment without payment, the judgment creditor
having no notice of the sale, and title was made to the executrix by the
mortgagee who purchased at the sheriff's sale, the action to enforce the
resulting trust must be brought within five years after the party defrauded with reasonable diligence might have discovered the fraud. The
facts that the plaintiff knew of the sheriff's sale shortly after it took place
and that the defendant's acts of ownership which followed it were open
and notorious, were notice of the vesting of the title in her ; and no action
having been brought within five years of the time when with reasonable
diligence the fraud could have been discovered it cannot be maintained.

Argued April 16, 1900.  Appeal, No. 214, Jan. T., 1899,
by plaintiffs, from decree of C. P. Centre Co., Aug. T., 1895,

No. 64, dismissing bill in equity in case of E. J. Frost and George W. Fairer, Executors of A. C. Moore, deceased, v. Louisa Bush. Before GREEN, C. J. McCOLLUM, DEAN, BROWN and MESTREZAT, JJ. Affirmed.

Bill in equity to enforce a resulting trust.

The facts appear by the opinion of ARCHBALD, P. J., specially presiding, which was as follows:

### FINDINGS OF FACT.

1. Daniel G. Bush in his lifetime was a resident of Bellefonte, Centre county, Pennsylvania, and the owner of several valuable pieces of real estate there. One of them, the Bush House, consisted of a large four-story brick hotel with storerooms and places of business under it, and a brick stable and outbuildings in the rear, altogether of the value at the time of his death of $35,000 to $40,000. Another, know as Bush's arcade, was a three-story brick building, comprising a business block on the principal street of the borough and consisting of seven storerooms together with a large number of offices and private rooms, the land alone being worth about $12,000, and the building some $10,000 more. The occasion for separating these values will appear later. The third piece was also a business property upon the same street and consisted of a three-story brick building known as the McClain block of the value of $10,000; and the fourth was a brick residence on Spring street of the value with the land on which it was situated of $3,000. Notwithstanding this large amount of property, Mr. Bush at the time of his death was insolvent and his estate when settled paid but ten per cent of his general indebtedness, but this does not fairly represent the ratio of his property to his indebtedness but was due to the fact that his real estate just mentioned was sold soon after his death at sheriff's sale.

2. One of the principal items of Mr. Bush's indebtedness was a loan of $30,000 from the "Philadelphia Contributionship for the Insurance of Houses," secured by a mortgage dated June 7, 1879, and duly recorded, which covered the four pieces of property described above and being those in dispute between the parties. This debt was still further secured by insurance.

policies on the several buildings assigned to the company, those on the Bush arcade which figure specially in the case, amounting to $10,400. ·

3. Another large item of indebtedness was that due to A. C. Moore. Mr. Bush, with three others, had gone bail for the Beaver Mills Company, and default having been made the sureties were called upon to meet the obligation. Suit was brought by Mr. Moore to enforce it in the United States circuit court for the western district of Pennsylvania, to September term, 1872, against Bush, Blanchard, Armstrong and Taylor, the sureties, and judgment was recovered September 13, 1880, for $16,602.72. This judgment was the next lien after that of the mortgage to the contributionship company and was revived from time to time and the lien continued and preserved down to September 26, 1891, when judgment was entered for $22,957, the amount of the debt and accrued interest.

4. On September 23, 1886, D. G. Bush died, having previously made his will in which, after directing the payment of his debts and funeral expenses, he devised the residue of his estate, real, personal and mixed, to his widow, Louisa Bush, the defendant, and to his children, to each the share which he or she would be entitled to under the intestate laws of this commonwealth. He also appointed Mrs. Bush his executrix and a few days after her husband's death she proved the will and took out letters.

5. On January 9, 1887, three months and a half after Mr. Bush's death, the building on the arcade property was destroyed by fire, in consequence of which on January 19, ten days later, the contributionship company, the holder of the mortgage, resolved to call in the loan after applying the insurance money in reduction of it, and so notified Mrs. Bush, the executrix. On receiving this notice Mrs. Bush was very much distressed, and upon consultation with her attorney, Judge Love, he advised her to go and see Jacob Tome, a distant relative of hers and a man of great wealth, and see whether he would not take up the mortgage. She did this and Mr. Tome agreed to take it and thereupon on the application of Mrs. Bush the contributionship company, on February 18, 1887, assigned the mortgage and transferred the arcade policies together with $2,100 of insurance money already collected thereon, to Mr. Tome, he paying

them the sum of $30,700, the debt and interest due.  Judge Love assisted as counsel in affecting the transfer and his expenses to Philadelphia for the purpose were paid by Mrs. Bush out of the funds of the estate in her hands.

6. Two months later, on April 13, 1887, Mrs. Bush, as executrix, confessed judgment in an amicable scire facias on the mortgage in favor of Jacob Tome, the holder, for $31,585, being the debt and interest due on the face of the mortgage, $30,966 and two per cent attorney's commission, $619.  On the same day a lev. fa. was issued and the mortgaged property was advertised for sale by the sheriff April 25, some twelve days later.  On the latter date it was put up for sale and struck off to Judge Love as attorney for Jacob Tome, at a bid of $26,000 which was satisfied by him in the name of Mr. Tome as a first lien creditor by receipting on the judgment the amount of the bid less $178.95, the costs of sale, the amount applied upon the judgment in this way being $25,821.05.

7. On April 27, 1887, the sheriff of Centre county duly executed and acknowledged in open court a deed in pursuance of the sale to Jacob Tome for the land covered by the mortgage; and on May 16, following, Mr. Tome executed and delivered to the defendant Louisa Bush a deed in fee for the same land, she at the same time executing a mortgage for $30,000 in return, payable in four years with interest semi-annually.  The consideration named in the deed from Mr. Tome was $40,000 but this was a mistake, the real consideration being $30,000, the full amount for which the return mortgage was given. The deed and mortgage were recorded together August 6, 1887. After Mrs. Bush had obtained title to the property in this way Mr. Tome, for the purpose of assisting her to rebuild that which had been burned down, loaned her an additional $15,000 which was secured by a second mortgage on all the property conveyed to her.  With this and other money of her own she rebuilt the arcade building.

8. After receipting upon his judgment the sum of $25,821.05 the proceeds of the sheriff's sale, Mr. Tome applied the insurance money in his hands, $10,400, to the satisfaction of the unpaid balance, and on May 1, 1887, turned over the rest of it, $4,478.23, to Mrs. Bush as executrix, who later accounted for it in her final account filed November 25, 1891.  This money

was subsequently distributed to creditors and $2,492.90 of it was paid to Mr. Moore upon his judgment debt.

9. The purchase of the mortgage in question by Jacob Tome was made at the instance of Mrs. Bush for the manifest purpose of having it in friendly hands and relieving her from the immediate pressure of a threatened foreclosure by the contributionship company. The estate of her husband was hopelessly insolvent and she had no means or resources as executrix with which to work off the indebtedness or relieve the estate from its embarrassment or save the real estate from an ultimate sale, notwithstanding the value of the real estate, some $60,000 to $65,000, the liens against it, including the Moore judgment and others presently to be referred to, amounted to about $53,000 or $54,000, or, crediting the insurance money on the mortgage, say $43,000, leaving no. great margin of salvage in case of a forced sale such as was bound to follow. All these circumstances must be taken into consideration in judging of the conduct of the parties now called in question.

10. In bringing the mortgaged property to a sale, becoming the purchaser of it, and subsequently conveying it to Mrs. Bush, the purpose of Mr. Tome was to let Mrs. Bush, his relative, have the benefit of whatever value there might be in the property over and above what he had to give for it and this no doubt was also Mrs. Bush's expectation; but that there was any attempt, so far as Mr. Tome was concerned, to hinder, delay or defraud any of the creditors of D. G. Bush, I cannot find. He held the mortgage from February 18 until April 23, nearly two months, before doing anything upon it; the amicable action and confession of judgment to which Mrs. Bush as executrix agreed was no more than he could have obtained had a scire facias issued and adversary proceedings been had, and there would have been more costs made; the sale by the sheriff was after the recognized advertisement of ten days under the old statute of 1705; it was at a regular sales day and was openly and fairly conducted in the presence of a large concourse of people; Judge Love, as attorney for Mr. Tome, was instructed by him before the sale if anyone bid a fair price for any of the properties to let it go, and the pieces were accordingly put up separately and substantial bids made upon

each; after the bidding had reached a certain point in this way the bids were lumped together and the property put up as a whole and after still further bidding was struck off to Judge Love at $26,000, a large price under the circumstances, and one nearly sufficient to satisfy the mortgage. I cannot from any or all of this draw an inference of fraud.

11. So far, however, as Mrs. Bush is concerned the case is different. About ten days before the lev. fa. was issued Judge Love had a conversation with W. M. Walker, sheriff of the county, in which he stated that the property was to be sold and wanted to know what poundage he would take. Sheriff Walker was himself a creditor of D. G. Bush, having a judgment of $900 of the date of September 7, 1886, and upon this inquiry expressed his surprise that the estate was in such shape. Judge Love stated that the sale was simply for the purpose of changing the title and would go at a nominal figure; that Mr. Bush with a party of other gentlemen had gone on a bond in the circuit court and had been left in the lurch. Sheriff Walker then spoke of his own judgment and Judge Love told him that Mrs. Bush would give her individual obligation for that and for the judgment of Jonathan Harper, another creditor, so that neither of them would be interested in the sale. The question of poundage was not disposed of at that time but later on upon similar representations the sheriff agreed to take $125. A few days before the sale Sheriff Walker, Mr. Harper and his attorney, Mr. C. M. Bower, met Mrs. Bush at Judge Love's office, and she there gave them her individual obligation for their claims. It was again stated at that time that the sale was for the purpose of avoiding some claims that were pending in the United States circuit court in which Mr. Bush with Mr. Armstrong and Mr. Blanchard had been bail for the Beaver Mills Company, and which it was considered were not entitled to the same protection as the claims of home creditors; and the purpose given for paying off the judgments of Sheriff Walker and Mr. Harper was so that they would not be interested to bid at the sale, although there was no agreement that they should not do so. The matter referred to in this conversation as pending in the United States court was the claim of A. C. Moore. The facts so found are sworn to both by Sheriff Walker and Mr. Bower in such detail that I cannot escape finding them. There is no evidence how-

ever that Mr. Tome personally knew of the purchase of these judgments by Mrs. Bush or the purpose of it, and he took no part himself in either.

12. A. C. Moore of whom mention has been made, was a resident in his lifetime of Norfolk, in the state of Virginia, where he died in January, 1892, leaving a will and appointing E. J. Frost and George W. Fairer, the plaintiffs, as his executors. He had business interests, however, in Williamsport, Pennsylvainia and resided there at one time, and he was frequently there in that connection. Soon after the sheriff's sale Judge Love as attorney for Mrs. Bush, met him in the city at the Park House, and endeavored to effect a compromise of his claim offering him $2,500 to settle. He also met him a second time at the same place soon afterwards, on the 16th or 17th of May, 1887, in the same endeavor. On each occasion Mr. Moore was informed that the sale had taken place and of the purchase of the property by Mr. Tome and of the insolvent condition of the Bush estate, but he refused to accept the offers made him.

13. There is no evidence that Mr. Moore actually knew of the purchase of the property by Mrs. Bush nor of the intent and endeavor on her part by means of the sheriff's sale to cut off his judgment, but he might with reasonable diligence have known of it at any time within six months or a year thereafter if not immediately. He had direct notice of the sheriff's sale which divested the title of D. G. Bush within a month after it took place, and the fact that notwithstanding it Mrs. Bush continued in possession of the property, rebuilding the part of it which had been burned down was, of sufficient significance to put him on inquiry as to how she held it; her deed from Mr. Tome was recorded August 6, following, which was further notice of her claim; and as a creditor of D. G. Bush who was dead and whose estate under the law might be settled at any time within a year, in the reasonable prosecution of his claim against it, he was called upon to look into the condition of the estate and particularly the disposition of the great bulk of it such as had taken place; and there is nothing to suggest that the facts on which the plaintiffs rely were not as readily discoverable immediately after the transaction as they are now.

14. In April, 1894, the plaintiffs as executors of A. C. Moore, deceased, under ancillary letters granted by the register of wills

of Lycoming county, issued a fi. fa. on his judgment in the
United States circuit court, a levy was made on the land in
dispute, an inquisition held, and a marshal's sale subsequently
made July 17, 1894, at which the plaintiffs became the pur-
chasers. A marshal's deed was duly executed and delivered
to them in pursuance of the sale October 12, following. At
the sale notice was given on behalf of Mrs. Bush that she was
the owner of the property.

15. On May 4, 1895, the present bill was filed. This was
more than five years after the time when with a reasonable dili-
gence A. C. Moore in his lifetime or the plaintiffs as his exe-
cutors after his death could have discovered the fraud which is
now set up to affect the legal title of the defendant.

### CONCLUSIONS OF LAW.

The law applicable to the foregoing facts is as follows :

1. As stated at the head of this report the purpose of the
bill is to impress upon the legal title a trust in favor of the
plaintiffs as to the land in dispute. It recognizes the legal
title as well vested in the defendant by virtue of the sheriff's
sale to Jacob Tome and the sale conveyance by him to the de-
fendant, but asserts that that title is affected with a trust in
favor of the estate of A. C. Moore by reason of the defendant's
fraud. See Silliman v. Haas, 151 Pa. 52.

2. The court has jurisdiction in equity of a bill of this char-
acter on the ground both of the trust and the fraud, although
an action of ejectment would also lie.

3. The trust on which the plaintiffs rely was not an express
but a resulting trust arising ex maleficio by reason of the
alleged fraud.

4. There was nothing to prevent Jacob Tome if he so desired
from becoming the owner of the mortgage held by the con-
tributionship company, the mortgagees, foreclosing it, pur-
chasing the property and reselling it to Mrs. Bush, giving her
the whole benefit of it if he chose, provided it was done with-
out any collusion or fraud. But he was affected with knowl-
ledge of any fraud or want of good faith on the part of Mrs.
Bush through the knowledge of Judge Love who was his agent,
as well as the agent of Mrs. Bush, in the transaction.

5. In her capacity as executrix Mrs. Bush was called upon

to manage for the best interest of creditors and others concerned so long as there was any chance to do so. But when there was no way of averting a foreclosure of the mortgage and a sale of the property she had the right to look to her own protection as widow and devisee. There was nothing to preclude her, therefore, by reason of her position as executrix from becoming a purchaser either through herself or another at the sheriff's sale of the property in dispute provided the sale was not brought about by her procurement and her purchase was made without effort or intent to defraud creditors or others interested.

6. Mrs. Bush had the right to purchase the judgments of Sheriff Walker and Jonathan Harper even though it might have the effect of removing these parties from the number of probable bidders at the coming sheriff's sale, and this could not of itself be set up to affect the validity of the sale unless the purchase was made with a fraudulent purpose. But having been made with the avowed intention of cutting off the judgment of A. C. Moore and having that practical effect, it was a fraud upon him and a resulting trust accrued in his favor in consequence.

7. The declarations of Judge Love as to the purpose of the sheriff's sale are not as against Jacob Tome to be taken as evidence that such was Mr. Tome's purpose, and are only evidence of it as against Mrs. Bush because they were repeated in her presence. But as already stated Mr. Tome was affected with notice of Mrs. Bush's purpose and is chargeable with connivance in it, because of the knowledge of Judge Love who was his agent also in the transaction.

8. By the 6th section of the Act of April 22, 1856, P. L. 532, " No right of entry shall accrue or action be maintained . . . . to enforce any implied or resulting trust as to realty, but within five years after . . . . such . . . . trust accrued . . . . unless such . . . . trust shall have been acknowledged by writing to subsist by the party to be charged therewith within the same period; provided that as to anyone affected with a trust by reason of his fraud, the said limitation shall begin to run only from the discovery thereof, or when with reasonable diligence the party defrauded might have discovered the same."

9. The act so quoted is a statute of repose and not of limita-

tion, and as such does not have to be specially pleaded, but advantage may be had of it at any time.

10. More than five years having elapsed since A. C. Moore, the party defrauded, in his lifetime, and the plaintiffs, his executors, after his death, could with reasonable diligence have discovered the said fraud, the trust resulting therefrom is barred by the statute and the present bill to enforce it cannot be maintained.

11. The bill should be dismissed with costs.

On exceptions the court filed an opinion which was in part as follows:

The real question in the case and the vital one in my view of it is entirely aside from this and is involved in the finding that Mr. Moore with reasonable diligence could have discovered the fraud perpetrated upon him within six months or a year after the sheriff's sale; and that he in his lifetime, or his executors upon his death, were bound to bring the present bill within the period of five years thereafter. I do not see that much can be profitably added to the arguments heretofore advanced for that position. It is said that " whatever is notice enough to excite attention and to put the party on his guard and call for an inquiry, is also notice of everything to which it is afterwards found that such inquiry might have led:" Swift v. Smith, 49 U. S. App. 181. In my judgment there was abundance here to put Mr. Moore upon his inquiry. If there was not I do not know what would. He knew of the sheriff's sale right after it occurred and could not fail to notice Mrs. Bush's continued possession notwithstanding it. Her acts of ownership which followed were open and positive. She rebuilt the arcade and leased and collected the rents of the other property. Had there been no foreclosure preceding this, or had Mr. Moore, notwithstanding its public character, had no actual knowledge of it, her acts might have been equivocal and inconclusive, but in the face of the sale they could not be. That sale in effect divested her husband's title and transferred it to Mr. Tome. How then was she there, was a natural inquiry, and to any one who expected to challenge her title, a necessary one. Had it been made it could not have failed to lead at once to all that has now been disclosed. Her deed was on record;

her possession was open and notorious; it was not in the line of her duties as executrix, which the sheriff's sale had brought to an end. By that sale the judgment of Mr. Moore was divested of its lien, and within six months after it, the year which the executrix had in which to make her first settlement of the estate expired. All these circumstances combine to establish that Mr. Moore as a creditor and a lien creditor at that, in the exercise of reasonable diligence in following up the collection of his judgment debt, was bound to look into the question of Mrs. Bush's continued possession; and had this line of inquiry been pursued there could have been but one result.

In Norris v. Haggin, 136 U. S. 386, the plaintiff filed a bill to charge the defendants who were at one time his attorneys with having fraudulently procured from him while mentally incapacitated a mortgage on valuable property which they subsequently foreclosed. He regained his mental faculties in 1869 and consulted an attorney at that time with regard to the case but did not file his bill until 1884 some fifteen years later. In dismissing the bill it was held that as the facts which constituted the alleged fraud were open and could not fail to have been discovered by any sort of inquiry or investigation, as soon as the plaintiff was mentally competent, there was no room for the suggestion that they were only discovered a year or two before suit brought. " The acts which constituted the fraud as alleged in the bill," says MILLER, J., "were open and public acts. The note and the mortgage were recorded in the proper public office of the proper county. The possession of defendants was obtained by judicial proceedings which were open to everybody's examination and which were probably known to the entire community." There was, it is true, the superadded circumstance that the plaintiffs by consulting counsel in 1869 must have known at that time of the intent of the defendant to hold the property adversely, but the other facts alluded to, many of which are suggestive of the case in hand, are also considered of significance as the quotation from the opinion shows. In Scranton Gas & Water Company v. Lackawanna Iron & Coal Company, 167 Pa. 136, an action was brought for water alleged to have been surreptitiously taken in excess of that allowed by an existing contract extending through a period of some ten years. In response to the plea of the statute as to all

over six years, the plaintiffs set up that they did not know of the taking, but it was held that this under the circumstances could not avail them. " What an owner might know if he was personally present by himself or his employees on the surface of his possessions," says WILLIAMS, J., " he is bound to know unless his attention is diverted by the fraudulent artifices of the wrongdoer. Silence or concealment will not prevent the running of the statute : Sankey v. McElevey, 104 Pa. 265. The question in any given case is not what did the plaintiff know of the injury done him, but what might he have known by the use of the means of information within his reach with the vigilance the law requires of him." While this decision may not be strictly in line with the present question it borders on it as does the other cited, and shows to what extent the courts will enforce the doctrine that the means of knowledge and the duty of inquiry amount to notice of all that either would have revealed.

These observations cover all that there seems to be any occasion to discuss. The exceptions are numerous but they are principally directed to the two questions which have been touched upon. The new point made that the amicable scire facias and the levari facias which followed it contained no description of the premises and that the sheriff's sale in consequence conveyed no title, is readily disposed of. This is not the forum in which to inquire into the legality of the sale, and just as soon as the plaintiffs seek to turn the case into a trial of titles by such a suggestion, they put themselves out of court.

This case came on to be heard upon exceptions to the findings of fact and conclusions of law heretofore made from the evidence ; and thereupon on due consideration thereof and of the arguments of counsel the exceptions are overruled ; and it is thereupon ordered, adjudged and decreed that the bill of complaint be dismissed and that the plaintiffs pay the costs.

*Error assigned* among others was decree dismissing bill.

*Charles P. Hews* and *William W. Hart*, for appellants.—The trust created in Louisa Bush, the respondent, as executrix of the last will and testament of Daniel G. Bush, deceased, was a direct and express trust in the lands of the decedent, and she

could not, whilst acting as such trustee, fraudulently procure
title to the trust estate, for the avowed purpose of defrauding
the creditors so defrauded freed from such trust: McClintock's
App., 29 Pa. 360; McCandless's Est., 61 Pa. 1; Beeson v.
Beeson, 9 Pa. 283; Kittel's Est., 156 Pa. 451; Mellish's Est., 1
Parsons, 482; Ashhurst's App., 60 Pa. 315; Beeson v. Beeson,
9 Pa. 279; McGinn v. Shaeffer, 7 Watts, 415; Chorpenning's
App., 32 Pa. 315.

We further contend that the interest which Louisa Bush,
the respondent, takes in the property in controversy under the
will of Bush, or by virtue of the intestate laws, as his widow,
creates a community of interest, or an express trust as between
her and the creditors of Bush: Weaver v. Wible, 25 Pa. 271;
Enyard v. Enyard, 190 Pa. 114; Tanney v. Tanney, 159 Pa.
277; Powell v. Lantzy, 173 Pa. 549; Duplaine's Est., 185 Pa.
332.

Neither the plaintiffs nor their testator can be charged with
such delay in seeking redress as can defeat their right to sus-
tain this proceeding in the absence of proof of actual notice of
the fraud of the trustee, and of her repudiation of the trust:
Marshall's Est., 138 Pa. 285; Bruner v. Finley, 187 Pa. 389.

Conceding, for the sake of the argument, however, that this
is an implied or resulting trust as held by the court, there is
nothing in the evidence to warrant the court in finding as a
fact, or holding as a legal conclusion that A. C. Moore, in his
lifetime, or his executors after his death, were not as "reasonably
diligent" as the law requires in the discovery of the fraud upon
which the court bases the trust: Hughes v. First Nat. Bank,
110 Pa. 429; Wickersham v. Lee, 83 Pa. 416; Mitchell v. Buf-
fington, 10 W. N. C. 361.

*Wilbur F. Reeder*, with him *Henry C. Quigley*, for appellee.
Under the act of assembly, the plaintiff has been guilty of
such laches that the bill cannot be maintained: Ashurst's App.,
60 Pa. 315; Morrell v. Trotter, 15 Phila. 201; 2 Pomeroy's
Equity, sec. 917; Hollinshead's App., 103 Pa. 158; Christy v.
Sill, 95 Pa. 380; Barry v. Hill, 166 Pa. 344; Silliman v. Haas,
151 Pa. 52; McKean v. Clay, 149 Pa. 277; Roy v. Townsend,
78 Pa. 329; Best v. Campbell, 62 Pa. 476; Maul v. Rider, 51
Pa. 377; Trickett on Limitations, sec. 145; Huffnagle v. Black-

burn, 137 Pa. 633 ; Barrett v. Bamber, 81 Pa. 247 ; Way v. Hooton, 156 Pa. 8.

PER CURIAM, April 30, 1900 :

We agree with the learned court below in holding that the claim of the plaintiffs is barred by the statute of limitations of April 22, 1856, and the decree is affirmed upon so much of the opinion as relates to that subject.

Decree affirmed and appeal dismissed at the cost of the appellants.